Your honors, I'm Donna Grodner from Baton Rouge, Louisiana, and I'm here this morning on behalf of Mr. Brian Edwards and his mother, I mean, Mr. Brian Porter and his mother, Ms. Sharon Edwards. Your honor, there was a summary judgment granted in the district court in Baton Rouge, and we're here today asking the court to reverse that summary judgment, finding there are material issues of fact that preclude summary judgment on these Fourth Amendment, Fifth Amendment, and Fourteenth Amendment claims, illegal search and seizure, and improper lineup, and also that the court find that qualified immunity does not apply to Beards, Lear, or Barbin. We also ask the court to find that the district court erred in not striking the hearsay evidence and in considering it on summary judgment, and we also finally ask the court to find that the trial court erred in striking our expert. Now, on July 31, 2013, Mr. Brian Porter was sitting in his easy chair in his house on Laurel Street in North Baton Rouge. His mother was in her 18-wheeler driving in from work with a load to her home, which was virtually next door to his home. When his door was broken down, police officers came in, and he was arrested for four robberies that had occurred in Baton Rouge in the month of July. His mother's home was broken into. She had a daughter, a pregnant daughter there with ‑‑ Okay, other than bystander-type liability to the extent there may be such, what did Beard and Barbin specifically do that violated the Constitution? Well, let's take Barbin, Your Honor. Let's start with Barbin. Detective Barbin was at the Wendy's on Florida during the second robbery. He had been there earlier that day, and he had interviewed some of the clerks. By that time, they had gotten the photograph from the still photo that they had gotten from the video from the first robbery from the Family Dollar store that was taken in the parking lot, a partial photograph. And they had, by this time, done a Crimestoppers review, running on Crimestoppers, and they had someone call in, allegedly, and say, well, we think this is Brian Porter, who is my client. They then had placed his face, although he didn't match the physical descriptions, into a photo lineup. So they went to the store that day that had been robbed before, the Wendy's on Florida, and they interviewed some of the clerks there. And the clerks had previously said that the people who robbed the store were wearing masks over their faces and gave very little description of these robbers. And there were two that robbed the Wendy's the first time. And my client did not match the physical descriptions that were given by these individuals who witnessed this first robbery. Nevertheless, they went back, interviewed these individuals, and tried to get them to identify. I mean, you keep saying they. The problem that I have is that you're tending to mush together everybody. And I'm asking a specific question about Beard and Barbin. What did they do that violated the Constitution? And then I want to know how that connected to anything that – because, of course, if they wrote an affidavit after he was arrested, he's already in prison, it doesn't seem to make much difference. If they didn't write an affidavit, then that also doesn't make a difference. So tell me specifically, because I understand the concerns with Lear, but I'm having a little trouble with Beard and Barbin other than the bystander argument. Thank you, Your Honor. I was just giving a little background to show the seriousness. Well, we have background, and I'm asking specific questions I'd like you to address. Yes, Your Honor. The seriousness of what Barbin did. Okay. And so Barbin went in. He interviewed these people. He got a couple of people to say, yeah, that number two. That same day, that particular Wendy's on Florida was robbed again. Barbin went back. He talked to the same clerk again. By that time and with the descriptions that were given, he knew that it was not Brian Porter who these clerks had identified earlier, and he testified to that. Despite him knowing that Brian Porter had been disqualified by his identification and not matching the identifications, that happened on July 28th. Two days later, Your Honor, he went and swore out an affidavit at the request of Lear, and I've cited that in my brief, the citation to that. So he was working in concert with Lear. At that time, Your Honor, he had a duty to speak up, and obviously Lear must have known that this man didn't match the identifications, and he testified the reason he didn't re-show them these photographs, this photo lineup afterwards was because he knew that it wasn't Brian Porter. Two days later, he's swearing out an affidavit to go get arrest warrants and search warrants. So that's a little bit more than a backseat driver, Your Honor. He's actually directing and assisting. Now let's get to Beard. What did Beard do? Beard was basically another person who assisted in getting the warrants, and he swore out a warrant on July 30th also. Now Beard was the person who swore out the affidavit on the Plank Road robbery. Your Honor, just by way of background, they had the first robbery was a family dollar store. Then they had the robbery of the Wendy's, then the robbery of the Plank Road. He did not investigate the Plank Road robbery. He did not speak to any of those witnesses. He did not corroborate anything that was said. He swore out an affidavit two days later on the 30th also that said that Brian Porter matched the identifications given by these witnesses, when in fact he testified under oath that he based that entirely upon what another detective had told him. Your Honor, they say qualified immunity is to protect those that are malicious, they have intent, or those that are clearly inept. This is beyond being inept. These three officers got together on July 30th for the purpose of swearing out multiple affidavits to bring to Judge Trudy White to suggest to her by omitting material evidence that Brian Porter had in fact robbed these establishments. So the involvement of Beard was more than just... and interviewed some of the store clerks before the second robbery. Where in the record does it state that they were all there doing those affidavits on the 30th? I have a record site where he says that he was asked by Lear to assist with getting the affidavits.  Okay, I thought that was on the 31st that he did that affidavit, which is after this took place. So I'm wondering if there's... in the contemporaneous time when Officer Lear prepared his several affidavits, were the other two working with him? Where is that in the record? Yes, Your Honor. For one, Your Honor, the dates are all the same on the affidavits. Number two, I have a citation to the record where detectives... there was testimony that Detective Lear was seeking affidavits to obtain a search mark. That's at page 12 and 13 of my original brief. Footnote 46, I cited record on appeal, page 483, Barb and Depot at 21, lines 1 through record on appeal, page 483. And I cited Barb and Depot at 22, lines 15 through 8, Your Honor. It must be 18. So, Your Honors, in this case, they basically ignored all of the exculpatory evidence that Mr. Brian Porter didn't match these descriptions. The first two places that were robbed, the store clerk said facial tattoos, marks on face in the first two. They threw that out. They never checked into the height. The fact that all they had was a description of this individual and a photograph. The age differences. As the robberies go on, the robbers get shorter and shorter, and my client's still 6'4". It's only until the last robbery of the Wendy's on Florida, when they knew it wasn't Mr. Porter, that someone says, oh, he was around 6'4". Yes, Your Honor? You say that all the affidavits have the same date. I'm sorry to be hung up on this. No. But the judge here says that some of these happened on the 30th, and then on the 31st, the same day as the arrest, Beard filed an affidavit for attempted armed robbery of the Wendy's, that that's a different day. So do you mean they're mostly on the same day, or do you think this court is wrong? The 31st, Your Honor. So some are on the 30th, and some are on the 31st. Do you agree with that? I don't have Lear's in front of me right now, Your Honor, but I assume, Your Honor, his may have been on the 30th. Okay. These two are on the 31st, and they were used to charge my client with these two robberies. But he'd already been arrested. He had been arrested. He was arrested for and charged with four robberies. And as Your Honors may have noticed, one of the robberies isn't even included in any of the affidavits. The robbery from the original robbery of the Wendy's that he was charged with. Well, now, you agree that there could be a gang of several people that go around and everybody has their own shift of who does the robberies. It doesn't have to be the identical same three guys at every place, right? That happens in life, that there's a gang of criminals, and three of them go and do one place, and a different three do another place, or two of the same guys go and a different third guy goes. I mean, it's not required that they all be the same. Well, the facts of this case, Your Honor, are that my client was identified off of a photograph taken from a video in a parking lot on the first robbery. So he allegedly was a participant in the first robbery. The same weapon that ties all these together is the same weapon. It was a sawed-off shotgun with duct tape, the magnetic, the silver tape on it. So this particular individual that was in this first robbery that they said that it was Mr. Porter had facial tattoos. Two of the witnesses said facial tattoos, and they put him right around six foot. So my client didn't have the facial tattoos. He's not around six foot. There was never any sort of lineup other than a photograph and some person allegedly calling into Crimestoppers. So from there forward, this person was allegedly participating in all of these robberies. They called them a string of robberies, and they alleged that my client was involved in this string of robberies. When they ran the article in the newspaper, when they ran the Crimestoppers, they talked about it. Let me ask you this. If we assume arguendo, and I know you disagree, but if we assume arguendo that the warrant was proper and his home was searched, perhaps violently, but searched pursuant to a proper warrant, then you would agree that the finding of the illegal weapon would be enough to detain him thereafter. Not as a fruit of a poisonous tree. Okay, but you didn't make the assumption I asked you to make, which is assume the warrant was proper. Then the detention would have also been proper on what was found in the home. I know you disagree that the warrant was proper, and that's fine. I'm not binding you to that. I'm just saying if the warrant was proper, then what happened thereafter? Judge, I'm out of time. Do I have to answer that question? Yes, you still have a minute and 53. Thank you, Your Honor. Your Honor, I think hypothetically, your answer is going to be correct hypothetically, but as the facts of this case, the answer is not correct. Because you think the warrant was improper. Because the warrant was improper. They intentionally omitted exculpatory evidence from the warrant. Thank you, Your Honor. You still have a minute and 28. You have a minute and 27 if you want to use it. Can I reserve it? Yes, you may. No, you can reserve it. Thank you. Thank you, Your Honor. Thank you. May it please the court, Deeley Morris on behalf of Baton Rouge police officers, Jordan Lear, Orsini Beard, and Paul Barbin. We're here today basically starting off with a very simple issue. The warrants that were obtained in this matter, were they valid and or reasonable? The warrants are applicable to two incidences, the July 13th robbery of the Family Dollar and the July 14th robbery of a Wendy's. During Officer Lear's investigation of these robberies, he received credible information, descriptive information, from eyewitnesses at the scenes of the crime. He performed an objective investigation and reviewed surveillance video, obtained a photo from that surveillance video, which, by the way, that surveillance video is from the inside of the store, not the outside of the parking lot. That photo was put on local news stations, Crimestoppers, and he was able to obtain a lead, an identification of a Mr. Brian Porter. He took that lead and he decided to go into police databases and review the descriptions of Mr. Porter, and he found that they somewhat matched. From that, he decided reasonably... Somewhat matched. Somewhat matched, yes, Your Honor. Careful use of words there. Okay. Did he disclose to the judge that there was this discrepancy? He did not disclose to the judge that there was a couple-inch discrepancy, and I would argue that these discrepancies... Tattoos on a face are a pretty big deal. Now... You can't, I mean... There was no actual... There was no removal between the time. I absolutely understand. However, in this situation, there was no actual identification of a tattoo. Two of the witnesses out of about five or six said... One said, a possible tattoo around the eye, and the other person said, possible mark on the forehead. Nobody gave a confirmed, there's a tattoo, it's a snake on his face. There's no description to the tattoo. I mean, if we're talking about a mark, it could have been a mole. We don't really know. So these are very... What could be the kind of war paint stuff people use at football games? Correct, and that is also something that... Stuff can be on your face one day and not the other. I agree, not a tattoo, but stuff. Absolutely, and that is also something that Officer Lear takes into consideration, that people doing these things can put different kinds of marks on their face to try to throw off identification. As a matter of fact, in the report, you'll see that one person was speaking with a foreign accent, and the witness doubted whether that accent was real. So perpetrators of crimes often do things to try to throw people off. Well, I'm not seeing a mark on this Exhibit 6. Correct, and neither did Officer Lear. And there's more surveillance video where that came from. So after that, he took a photo created for a photographic lineup of six people, or five other people, I should say, with similar characteristics and features, and he presented those lineups to... Well, let's start with one person from the family, Dollar, who positively identified this individual. She also had mentioned that she thought his height was between 6'1 and 6'2. Again, depending on who you are, how tall you are, and under duress, you're never going to get a perfect, or you might not get a perfect description of height. So that's an interesting point. If I'm 5 feet tall, I would perceive a lot of people as taller than if I'm 6 feet tall, I might perceive people as short. Correct. Because my perspective is looking up or down. Does that actually influence people? Yes, I think so. And as a matter of fact, let's say I have heels on today, but if I wasn't wearing the heels at the time and I saw somebody that's 6 foot, I might assume that they were actually tall. But this is all speculation, right? There's nothing in the record that says that a 5-foot person has trouble perceiving this. You know, I'm a 5-foot person. So this is just your speculating and musing about this. This is just part of the investigation. Is this how the investigators analyze these differences, though? Because we know someone robbed a store, and yet we're getting different heights. Absolutely. Is that in the record? What part is in the record? That they made an allowance for these heights, because is that in the record? I believe one of the officers did, in his deposition, state that exactly that factor does come into play. Did Officer Lear state that? No, he did not state that. He never stated that. No, he did not state that directly in his deposition. Is it just Officer Lear involved in the first set of affidavits, or is opposing counsel correct in everybody's involved? No. Officer Lear is the lead detective on the first two affidavits that were used to apply for the warrant. This is a group of detectives that works armed robberies, and so they all collaborate together. They trade information and such. But as you can see from the incident reports, this is the lead detective on the case. Did they contribute to this? So if he's liable, then they're liable. I think that Officer Lear's initial investigations that started this off, he was the lead. But you said they were all working together. I think that they communicate information that they have together. But, you know, obviously they all know whether or not this Wendy's was robbed or, you know, the Wendy's was robbed again. They do share that information. So is the court in a position to rule that they are not involved in this, the seeking the affidavits, the second two people, or are we not in a position to rule that? I'm sorry. I apologize. Are we talking about Officers Barbin and? Yes. No, I believe Officers Barbin and Beard are responsible for their investigations, in which case they filed those APCs, and the court is correct. Those were filed after he was arrested. So they weren't involved in the one that Officer Lear was doing? Because just a second ago you were saying they're all together. I'm just trying to clarify this. I understand. I mean, like I said, they're not involved in this. What does the record say? The record states that there was no activity on Officer Lear's cases that Officer Beard and Barbin performed. I apologize for this because it is a lot of cases. There may have been one witness that was interviewed by Beard on a Lear case, but that would be the extent of it. Now, I do want to go in touch on this real quick. As far as stating that if Officer Beard and Barbin had any kind of information that would show that Officer Lear had the wrong guy, I don't see that at all. Because what happens in the July 22nd, which is Officer Beard's investigation, and the July 29th investigation, we have not that much information gathered from those robberies, unfortunately. Officer Beard did interview two suspects. What he gathered from that was that the same weapon was used, a sawed-off shotgun with duct tape on the handle, and that the witnesses couldn't provide a very good description at that point in time. Then on the 29th, Officer Beard and Officer Barbin interviewed one witness who had a couple height ideas as to the perpetrators. Officer Beard had interviewed two witnesses that had taller height identifiers. But in that situation, all of the men were masked. So the opposing counsel says things like, they knew he wasn't the person. The witnesses in that robbery couldn't be shown the lineup. That's not the case, because they were all masked. Officer Barbin does say that in his deposition. It's because they were masked, not because they knew that he was the wrong person. It's because the robbers were masked, and you can't do a photo lineup when you have masked robbers, fully ski-masked robbers in this situation. So that's a point of clarification. Again, going back to the warrant of Officer Lear, he put in there that he had multiple... Again, in the first robbery, he had one positive photo lineup identification that stemmed from a Crimestoppers tip, and that obviously he had his own discretion in reviewing the evidence and comparing the traits of Mr. Porter in comparison to what the evidence he had at the time. And just based upon the lineups alone, I believe that the information that is contained in those affidavits for the warrant, there is no intentional or misleading... There's no information, no misstatements contained in those warrants, which is the standard. You have to have either a false statement or an omission, and they have to be made knowingly, intentionally, or with reckless disregard. And it also has to be material to finding probable cause. There are no material misrepresentations in the affidavit that supports the warrant. It is what it is. Now, as far as the alleged omissions, again, two witnesses that describe possible tattoos or possible marks on a face is simply not enough to include... I don't find it to be exculpatory evidence. Same thing with height differences. These things are subject to perception, and an officer has the discretion to weigh some evidence and decide what he can rely on and what he can't rely on. Do you have some kind of case that would be helpful to us that just says this and supports your position? Not off the top of my head, Your Honor. I apologize. Do you have a case to the contrary that would put them on notice that they can't do that, which is what's required for qualified immunity, clearly? No. And basically, the cases that I have state that, again, it is talking about material misrepresentations or material omissions, and I think that the definition of material is not going to fall within these possibilities and height differences. So maybe that's where it should go, that these are not material omissions. Is there anything that would put them on notice that they're required when witnesses might give varying heights are required to put that in the affidavit? I don't think that there's any standard as to exactly what needs to be put into an affidavit to support a warrant. It's just basically that you provide the evidence that you have, and then you put that before a judge, and then the judge is the intermediary that decides whether or not probable cause exists. And at that point in time, the chain of false arrest is broken, assuming that he or she confines within these guidelines. But even if we were to decide that they were material, again, I think he's very reasonable going back to, again, it's not a case, but the standard is being reasonable. A reasonable officer has to say, to trust, well, I have five witnesses here, and only two of them talk about a possibility of a tattoo. And not to mention the fact that the people that mentioned the possibility of a tattoo actually identified positively Mr. Porter in that lineup, who does not have a marking on his face. Again, as the court has already mentioned, the photo does not have a marking on his face. And like I said... Where exactly was the marking on the actual criminal, the actual robber? I believe that one of the individuals that was arrested had a teardrop, like just an outline teardrop over here. All right by the eye? Correct. But I am not quite sure if he is the actual perpetrator from the family dollar. Like you said, and the court has noted, this was a group of individuals, and obviously not the exact same people. But I thought ultimately a trio of people was, in fact. Right, but, you know, the first robbery was done by one person. The second robbery was done by two people. So who's who, what's what. Correct. Yes. But is this the guy in Exhibit 6, is this the guy with the teardrop? Exhibit 6 is the one she keeps holding up. This is the person, this is the perpetrator from the family dollar. Like I said. But is that the teardrop? Somebody, I don't know. Somebody was, because 20-20 hindsight isn't something that we look at in this situation. We try to stay within the confines of what the officer knew at the time. And I made that argument that it doesn't even matter who was inevitably arrested or what he had was because that's not what the officer knew at the time. What about this argument that, okay, at the time, the time time, maybe they didn't know this, but they started gathering more and more information that called into question Porter's complicity here and didn't do anything with it until the three guys were brought to four and then it was clear it wasn't Porter, and then they let him go for that, although I think they held him on the other charge, which was ultimately dismissed. What about that argument? That actually is a little incorrect. The officer Porter had gotten a DNA analysis of the bandana that was dropped in the store at the family dollar, and that DNA did. Officer who? Officer Lear. Lear, okay. He notified the district. At that point in time when the Louisiana State Police Crime Lab had come back with the results from that analysis, he immediately notified the district attorney's office that Mr. Porter had already been arrested, and at that point in time it's in the hands of the DA's office. And just to make mention that the bill of information filed by the DA's office, to go back to Barbin and Beard, the bill of information does not cite the crimes that were committed, the robberies that were committed on July 22nd and the 29th. They were strictly limited to the crimes that are talked about in the arrest. So this is even if Beard and Barbin lied, no harm, no foul argument, or where does that fit? I don't think that they lied. I think that everybody was operating with a similar modus operandi with this gun, with the group of individuals. I don't think that there was anything of super significance that would have negated the possibility of Brian Porter's participation in these crimes. And again, even in the last robbery, there was a suspect that was identified between 6-1 and 6-4 by two individuals. So it's just not enough. What were the range of heights for the person that was first identified as Porter? What were the range? You were saying all these people gave different heights, what were they? When you're talking to witnesses, they can't tell you exactly who Porter or who each one is. They talk about who they saw and what they did. The range in total of heights was from 5-10 to 6-4, I guess. But really I would say more like 6-2. But at that point in time, there were multiple individuals. When the 5-10 came about, there were multiple individuals that were participating. And other individuals, they didn't have heights that were given. So again, I don't think that these things rule out Porter as being a suspect at the time, based on the information that he had. So anyway, going to Beard and Barbin, like I said, he was not arrested based upon the affidavits of probable cause that they had filed. And again, I don't think that there were any physical descriptions that would negate Porter as a suspect, especially given the same sawed-off shotgun, the same people. I mean, a lot of things were falling into the same category. And as far as the search is concerned, I'll touch briefly on that. Beard and Barbin weren't there. Beard and Barbin were not there at all. They're out of that. But then Lear said he was kind of standing in the doorway or whatever. The way it works is in these dangerous situations, the SRT team is the one that goes in and clears the scene, the house. And basically, they go in and they do what they need to do. He kind of hangs out outside. And once the scene is secured, then he goes in. So you're just saying they sued the wrong people? Because it seems like you shouldn't be able to just tear up somebody's place, whether it's a valid warrant or not. I mean, it sounds like they kind of went out of their way to just trash the place. And you're saying there's no recourse for that or just that they sued the wrong people? I think that if they wanted to, Officer Lear is not their supervisor. There is no evidence to show that he witnessed anybody tearing up the place, if that even in fact happened. Also, I would argue that the search was reasonable because based upon the, well, the no-knock would be reasonable, based upon the dangerous nature of the suspect that they were trying to get. And the type of evidence they were trying to recover, which is a lot of money. And you can stash it in a lot of places and a lot of good places. So, therefore, I do believe that a search of small areas is necessary in that situation. But, no, Officer Lear did not participate in that. There's no evidence to show that. Yeah, but when you're desperately looking for something you've misplaced in your house, are you tearing everything up? No, you're doing it carefully. You may be in a panic. You may be in a hurry. You lost your wallet or you lost your ID or something you really need. Maybe you're in a rush, but you're not tearing up your own house. So that's the argument here, that, yeah, you can look and maybe you can even look intently, but you don't need to be ripping up the house. There's no evidence, though, that shows that Officer Lear saw any of that occur or that he participated in that. And I think there's only evidence to show that he did not participate in that and he did not see that. So we don't need to decide how actionable the conduct was. For Lear to prevail on that, we would just need to say Lear wasn't involved. I would also offer in the alternative that the conduct was not unreasonable given the situation, but mostly I say that Lear is not involved. And, again, no evidence to support that he saw or could have done anything. Again, he's not a supervisor, so he couldn't intervene. He is just the detective, which is a completely different story than the SRT team, members of that team as well. I think that's about it, and I'm out of time, so I will go ahead and submit it for you all. Thank you very much. Counsel, you've saved time for rebuttal. Thank you, Laura. Your Honors, opposing counsel for the defendants keeps saying it was two witnesses that said possible facial markings. Two witnesses, two witnesses. It was two witnesses at the Family Dollar Store, and then at the very next place, at the Wendy's on Florida, there was another witness, the very next robbery that said facial markings. Now, this is the actual guy, Thomas Davis, who confessed. Which exhibit is he in? He's in tab five, Your Honor, of our excerpt, and you can see he's got a teardrop tattoo here on his face. I don't know what he did. I have to say this copy is not real distinctive that I have. I'll take your word for it. And, Your Honor, you can see he's got tattoos on his shoulders and his neck. I can't believe. This is what it looks like to me. But that goes back to this entire, look at this copy. This is what they ran on Crimestoppers, and they say, well, you know, people can't get the descriptions right on the heights and this and that. But yet they took someone calling in from Crimestoppers saying, hey, that looks like Brian Porter, and ran with it. And that's all they had. They won a pound over. But what else would you have them do? I mean, guys are showing up robbing places around Baton Rouge. They have a guy on video. Wouldn't it be appropriate for them to post that and then to pursue leads again on that? Isn't that what police officers are supposed to do to keep us all safe, et cetera? Right, but I think a jury that watches Crime Story or any of these shows is going to say, why didn't they go questioning? Why didn't they go look at this guy? Why didn't they follow up somehow? He looked up his picture. He did look at him. And he also did photo lineups. And the photo lineups, he should have known when he looked up his picture that he didn't match the other descriptions, and he doesn't even resemble this fellow. And the people who they did a photo lineup, that's totally unreasonable itself, to do a photo lineup with witnesses who never saw the man's face. He was wearing a mask. And they never even brought this photo in with Mr. Porter's photo. There was basically no follow-up. He did the easy thing. He went to a computer. He typed in a name. Case closed. That was his lead suspect, cleared by arrest. And they tear up this man's house. And, Your Honor, Judge Haynes, you said, well, were these officers on notice of some case that would have been out there to say, you've got to put exculpatory information in a warrant? There's Frank's. Frank's and its progeny. I mean, any officer that's been to the Post Academy knows you can't really ---- Actually, that's a high degree of generality. What I asked is whether there is a case that says you have to put the varying heights in the affidavit. And, actually, this qualified immunity case law has become fairly granular in requiring something more than simply, well, the law is that you're supposed to put all material exculpatory information. That's a high degree of generality. What I'm asking is whether there was something more specific. And so if you have a case on that, I would be interested in that. I don't think there's a case out there that says specifically that when there's varying heights, i.e., the witnesses say the man's 5'10 to 6' that came into our store, that he's a young person, that he has tattoos, that that has to go into a warrant for probable cause. But the case law says if that is the exculpatory evidence, then that goes into the warrant when you're trying to arrest someone who's 6'4", 35 years old, and light-complected. When everybody says the perpetrators are dark-complected. So although there's not specific wording, there is specificity enough in Frankston's progeny of cases that these officers know that they have to give an American citizen a fair shake before you go and do a search and seizure of someone's home and their mother's home and arrest them. Now, Your Honor, another point that was made was the photo lineup and the full masks and so forth. The photo lineup is fundamentally unfair when these individuals never saw the perpetrator's face for them to identify. They see as much as some eyes. So it was very important that what they would see is the person's body composure, how they walk, how they look, and they never did a lineup. Almost all the cases, Your Honor, there's a physical lineup that follows these type of photo IDs. Thank you. Thank you. Thank you, Counsel. Thank you for letting us be here in Houston. Thank you. I really enjoy being here. Thank you so much. Thank you. Thank you, Counsel. We have the argument. The case is submitted.